# EXHIBIT 1

☙ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**25CV05255**
D. VICTOR REYNOLDS
JUL 11, 2025 04:30 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

## IN THE SUPERIOR COURT OF COBB COUNTY
## STATE OF GEORGIA

SIWO LOGISTICS, INC.

        Plaintiffs,

v.

FEDERAL EXPRESS CORPORATION, a
Delaware corporation

        Defendant.

Civil Action No: _____

**JURY TRIAL DEMANDED**

## <u>COMPLAINT</u>

Plaintiff SIWO Logistics, Inc. files this complaint against the Defendant, Federal Express Corporation. ("FedEx"), alleging as follows:

## <u>PARTIES, JURISDICTION, AND VENUE</u>

1.      Plaintiff SIWO Logistics, Inc. ("SIWO"), is a Georgia for-profit corporation with its principal place of business at 8315 Royal Toon Drive, Duluth, GA 30097.

2.      Defendant, Federal Express Corporation (FedEx) (formerly FedEx Ground Package Systems, Inc.), is a Delaware corporation with its principal place of business at 942 South Shady Grove Road, Memphis, Tennessee, 38120. Federal Express maintains a registered agent address at 410 Peachtree Parkway, Suite 4245, Cumming, GA 30041 in Forsyth County.

3.      This Court has personal jurisdiction over Defendant FedEx because FedEx is registered to do business in the State of Georgia. *Cooper Tire & Rubber Co. v. McCall*, 312 Ga. 422, 437 (2021) (citing *Allstate Ins. Co. v. Klein*, 262 Ga. 599 (1992)).

4.      Venue is proper in this Court, including pursuant to O.C.G.A. § 14-2-510(b)(2) and (b)(3) because the contract at issue was made or was to be performed in Cobb County, the cause of action originated in Cobb County, and FedEx has an office and transacts business in Cobb County.

## STATEMENT OF FACTS

5.    From March 22, 2021, until October 10, 2024, SIWO was a FedEx Independent Service Provider ("Contractor"), operating out of the FedEx Station in Austell, Georgia.

6.    As required by FedEx, Mr. Brian Wei incorporated SIWO to operate as a FedEx Independent Service Provider (Contractor). SIWO and FedEx were inextricably connected through a contract: the Independent Service Provider Agreement (Agreement). SIWO—like most Contractors—could not (and was never intended to) function without an active Agreement with FedEx.

7.    To become a Contractor, Mr. Wei—through SIWO—invested hundreds of thousands of dollars to ramp SIWO up from nothing to present SIWO as a viable Contractor candidate for FedEx.

The FedEx Ground "Independent Service Provider" Business Model

8.    The FedEx Division that was formerly FedEx Ground Package Systems, Inc is an interstate motor carrier which coordinates small package pick-up, transportation, and delivery throughout the United States and Canada using a network of Contractors. In the United States, FedEx operates under US Department of Transportation license number 265752.

9.    FedEx has developed a "Hub-and-Spoke" network to deliver packages. FedEx's network spans over 700 sorting and distribution Stations (sometimes also called Hubs) around the United States and Canada. These Stations form the network among which small packages are picked up, transported, and delivered to FedEx Ground's customers.

10.    FedEx typically employs a single overarching Manager for each Station. These Station Managers enjoy broad discretion to manage their Stations, including the Station's Contractors, often having sole authority to re-contract, end a relationship with, or simply "not renew" Contractors.

11.    FedEx staffs its Stations with its own employees who sort, organize, and route packages within the Station, either to Contractors or to the trucks that move packages between

Stations. Once a package leaves a Station, however, it is turned over to Contractors, who pick up and deliver packages on assigned routes.

12.     Currently, FedEx's delivery network relies on approximately 7,000 Contractors across the United States to pick up and deliver packages.

13.     Typically, FedEx's Agreement with its Contractors has a one-year (or shorter) term. This means that a Contractor must renew their Agreement with FedEx every year—putting them in a state of constant instability, or risk losing out on—functionally—the only revenue stream that Contractor is allowed to have.

14.     Generally, to become part of FedEx's delivery network, Contractors can either buy an existing Contractors' Contracted Service Area with FedEx or—through a tightly managed bidding process—win an Independent Service Provider Agreement ("Agreement").[1] In either circumstance, the Contractor is buying (or winning) a Contracted Service Area—the Contractor's "delivery zone" where, but for a few exceptions, that Contractor has the exclusive right to deliver packages for FedEx. FedEx sets the Contracted Service Areas and assigns dollar values to those routes to pay Contractors, with some flexibility for package types and number of packages delivered.

FedEx's Onboarding, and Renewal Process

15.     Whether buying or bidding on routes, a prospective Contractor must prove that it can meet FedEx's exacting requirements.

16.     First, FedEx will only contract with Contractors if they are set up as Corporations. As such, many Contractors—who would otherwise operate as sole proprietorships, partnerships, or Limited Liability Companies—form Corporations expressly as a FedEx-required pre-condition of contracting with FedEx.

---

[1] FedEx uses a complex and sometimes confusing internal nomenclature. For example, "Routes" make up a Contracted Service Area (a/k/a the "CSA"), and the FedEx–Contractor Agreement is often called the Independent Service Provider Agreement (a/k/a an "ISPA").

17.     Second, FedEx requires Contractors to agree to a litany of requirements ranging from state and federal regulatory obligations to quality service metrics. FedEx buries many of these requirements in an elaborate system, which are not always immediately given to Contractors, and FedEx will regularly amend them without warning.

18.     Once they have contracted with FedEx, a Contractor's primary asset is the Contracted Service Area, which they—on paper—have the exclusive right to service so long as they are a FedEx Contractor.

19.     Contracted Service Areas can vary significantly, from a few urban neighborhoods to several hundred square miles of rural countryside. Prospective Contractors must come ready to deliver to the entire area on day one. This means that prospective Contractors must arrange to have delivery vehicles (which each Contractor is required to provide at its own expense) based on their Contracted Service Area's needs.

20.     If a prospective Contractor satisfies FedEx that it can meet FedEx's needs in each Contracted Service Area, FedEx will either let an outgoing Contractor sell the Contracted Service Area to the new Contractor or award the prospective Contractor the Contracted Service Area. No matter how a Contractor acquires a Contracted Service Area, FedEx signs a new Agreement with the Contractor.

21.     Each time a Contractor negotiates a new Agreement, FedEx presents a Contractor with "3 Options" for compensation. While each Option breaks down a Contractor's compensation differently (e.g., one Option will offer more weekly base compensation, lower per package delivery fees, or large package surcharges than the others, and vice versa, etc.) the total dollar value difference between the options is negligible. (Based on FedEx' internal numbers, which FedEx does not reveal to Contractors, FedEx projects package volumes and calculates the Contractor's projected revenue).

22.     On information and belief, FedEx will, as a rule, decrease the total compensation offered to the Contractor year-over-year, effectively squeezing them until they fail, then will rinse and repeat with a new Contractor to take over the Contracted Service Area.

23.     In late 2022 or early 2023, FedEx introduced a new "Medals System" which uses FedEx's internal metrics and an inscrutable algorithm to continually sort Contractors into Bronze (the worst), Silver, and Gold (the best) categories, which medals FedEx assigns to the Contractors monthly. FedEx uses the Contractors' Medal ranking to decide how to treat them, both during the contract period and when deciding to negotiate a new term for the Agreement. On information and belief, FedEx does not disclose the algorithm to Contractors. FedEx did not disclose the algorithm to SIWO.

24.     FedEx will not let Contractors renew their Agreements if they are Bronze in critical months leading up to the end of the Agreement's term.

25.     If a Contractor decides they no longer want to work with FedEx, Contractors often try selling their routes and remaining terms of their Agreements with FedEx. Contractors regularly try selling to other Contractors or to Prospective Contractors, but FedEx retains the right to approve or reject any sale ("Assignment"). According to the Agreement, FedEx will not withhold approval "unreasonably," although they may withhold approval if there are fewer than 90 days left in the Agreement term without further explanation. On information and belief, FedEx does not consistently apply the 90-day window consistently across selling Contractors.

The Agreement Gives FedEx License to Treat Contractors Arbitrarily and with Impunity.

26.     FedEx's relationship with its Contractors is a complicated and meticulously crafted system, where FedEx tightly manages nearly all Contractor's activities through the Agreement and other opaque internal policies that give FedEx exceptional levels of day-to-day control over Contractors and Contractors' employees (i.e., "Drivers").

27.     The Contractors hire Drivers to deliver packages for them to satisfy their Agreement obligations to FedEx. While Contractors hire Drivers and are liable to pay the commensurate taxes, payroll, and workers compensation, FedEx has final say over whether those Drivers actually can drive for the Contractors. Drivers must meet FedEx's internal criteria before

FedEx will let Drivers drive for Contractors. While Contractors have a theoretical right to hire whomever they like, in practice they are not able to hire (and retain) someone without FedEx's approval.

28.     The Agreement purportedly creates an "independent contractor" relationship with Contractors, but once a Contractor signs the Agreement, FedEx effectively controls nearly every aspect of the Contractor's operations, employees (including hiring and firing decisions), and even management structure, while maintaining a veil that hides what might as well be an employer-employee relationship.

29.     While FedEx claims to negotiate each Agreement with its Contractors separately, on information and belief, every term in the Agreement outside the Schedules (defining the routes, etc.) is adhesive, including FedEx's Arbitration and Delegation Clauses.

30.     Facially, the Agreement appears to safeguard against wrongful termination or baseless non-renewal; but in practice, FedEx enjoys a one-sided "at will" arrangement with Contractors.

31.     The Agreement does not lay out every policy that governs the relationship between FedEx and Contractors. The Agreement incorporates by reference numerous internal policies and procedures that were not available to SIWO until SIWO already signed the Agreement. Furthermore, FedEx enjoys broad discretion to, and therefore will regularly, change the policies and procedures imposed on the Contractors.

32.     SIWO was required, under the Agreement, to keep its business records for its operations on FedEx's online platform, MyGroundBiz.com. Through MyGroundBiz, FedEx had complete access to SIWO's financial health, including payroll, taxes, debt service obligations, and even profit margins. FedEx regularly audits Contractors financial and other business records.

33.     FedEx "recommends" the vehicles the Contractor should use for their Contracted Service Area. FedEx tailors the Contractor's compensation (which includes fuel reimbursements and vehicle leaseback payments) using these "recommendations." If a Contractor deviates from FedEx's recommendations, FedEx won't reimburse them enough to cover the extra expenses the

Contractor incurs. As part of the Agreement, FedEx makes Contractors buy delivery vehicles and then lease them to FedEx, so FedEx can use its USDOT number on Contractors' vehicles.

34.     Although Contractors are responsible for their Drivers, FedEx effectively decides who can drive the Contractor's delivery vehicles. A Contractor may hire someone to deliver packages, but FedEx has the final right to approve every person driving a truck for the Contractor. Contractors must put their Drivers through FedEx's elaborate "qualification" system. Once qualified, Contractors' employees are effectively fungible between Contractors. Once FedEx approves a Driver to drive a Contractor's truck, the Driver can take that approval to any other Contractor. In fact, Drivers routinely move from Contractor to Contractor as new Contractors sign on and old Contractors leave. Although a Contractor is responsible for their Drivers while the Contractor employs them, FedEx controls the Driver's badge and qualifications to drive. The Contractor must spend considerable time and money to qualify Drivers to drive for FedEx.

35.     FedEx effectively dictates Contractor's management organization. Under the Agreement, Contractors must identify an "Authorized Officer" and a Business Contact (i.e., Manager and Assistant Manager) who liaise with Station Managers and other FedEx personnel. The Authorized Officer is FedEx's point of contact for the Agreement and the Business Contact who oversees the Contractor's day-to-day operations.

36.     When read carefully, the Agreement does not actually impose any duties on FedEx. Nearly every Section in the Agreement includes a "subject to amendment" clause. For example, the Contractor's exclusive "right to service" a Contracted Service Area (i.e., the Routes)—the key asset that Contractors gets in this arrangement—is tempered by a clause that states, in relevant part:

> [SIWO] further agrees that [FedEx] may, in its discretion and upon providing advance notice that is reasonable under the circumstances, redefine the [Contracted Service Area], including [redefining it, decreasing (or increasing) its geographic size, adapting the character of its boundary (to expand and contract based on fluctuating stop and package density)], provided that [FedEx] undertakes a good faith effort to the extent practicable to generate a redefined

[Contracted Service Area] that is reasonably comparable to the then-current [Contracted Service Area] in terms of stops and package volumes, proximity to the [FedEx] Station... and projected contract revenue, accounting for cost reduction opportunities form optimization and/or redistribution, as applicable.

37.    While on its face, this paragraph limits FedEx's right to essentially re-write a Contractor's bargain with FedEx, the next paragraph makes clear that in practice, Contractors must simply accept what FedEx does to them:

If a [FedEx Contracted Service Area] redefinition under this provision materially changes the reasonable projected contract revenue, accounting for cost reduction opportunities from optimization and/or redefinition, as applicable, either Party may request negotiation of the Charges. In that event, the Parties shall negotiate in good faith (as that term is defined in this Agreement), provided that [Contractor] shall perform under the redefined [Contracted Service Area] if the Parties do not reach agreement. In that event, either Party may pursue the dispute resolution procedures in this Agreement, but only with respect to the issue of whether a Party negotiated in good faith. (emphasis added).

38.    The Agreement is rife with similarly worded exceptions with a "negotiated in good faith only" dispute resolution provision. But the Agreement defines good faith negotiations as "each Party conferring with the other at reasonable times and exchanging reasonable proposals toward the end of reaching agreement."

39.    If a Contractor does not agree to the changed terms, it simply doesn't matter. The Agreement compels them to perform whatever FedEx gives them to perform at FedEx's discretion.

40.    Once a Contractor pursues dispute resolution, their ability to seek a remedy is severely curtailed. As just one example, FedEx uses the Agreement to foreclose any meaningful discovery that could uncover systematic corporate misconduct because the Agreement proports to prohibit the Parties from deposing corporate representatives.

41.    While the actual relationship between the Contractor and FedEx involves multiple points of contact with FedEx, both inside and outside the Station, FedEx purports to impose severe discovery limits on each party. Each party may only depose three people, neither party may depose corporate representatives (despite the Agreement ostensibly being between two corporations), and

each side is limited to 25 interrogatories and 25 Requests for Production. The parties may identify just three electronic record Custodians, and those Custodians must come from the specific Station the Contractor operates from.

42.    FedEx's Arbitration Procedures similarly purport to block any meaningful discovery or litigation that may uncover systemic abuse or problems.

43.    While these limitations are facially mutual, in practice, the difference in size, complexity, and scope of the respective contracting parties makes the discovery limitations exceedingly one-sided. The Agreement, and other internal policies, ensure that FedEx has nearly all its Contractors' information before a dispute ever arises. In contrast, the Contractor does not have similar access to FedEx and must issue subpoenas to recover its own information from FedEx's MyGroundBiz.com servers.

44.    FedEx is one of the largest companies in the world with a deep bureaucracy and a complex business structure. Meanwhile, SIWO was comprised of Mr. Wei, an Assistant Manager or two, and between twelve and eighteen drivers.

45.    FedEx maintains the size difference intentionally. FedEx controls a Contractor's size and will block a Contractor if they try buying or bidding on Contracted Service Areas that would grow the Contractor beyond a certain size.

46.    FedEx also uses the Confidentiality provisions in the Arbitration Clause to create an unfair advantage as a repeat player in the arbitration system that it mandates. The Agreement purports to prohibit Contractors from combining claims or forming a class. The Agreement prohibits Contractors from discussing their arbitrations with each other. The Agreement goes as far as to do away with core legal principles, as the Agreement contracts away any preclusive or binding effect an arbitration has on FedEx, both with a specific Contractor and Contractors generally. FedEx can therefore gather institutional knowledge while denying Contractors the same opportunity, and even if Contractor prevails against FedEx, according to FedEx's Agreement, FedEx is in the exact same position relative to every Contractor. Perversely under the Agreement as written, FedEx could lose in arbitration against a Contractor for some offending conduct, then

engage in the exact same conduct the very next day and force the Contractor to relitigate the offending conduct from scratch.

47.      Even if a Contractor pursues dispute resolution and prevails, any victory is hollow. The Contractor is still bound to perform and according to the Agreement's arbitration clause "The arbitrator shall have no authority to enter an award that alters, amends or modifies any of the terms and conditions of this Agreement, in any form or manner." In practice, the Agreement deprives Contractors of most meaningful remedies, even when FedEx is found to be at fault.

48.      FedEx can also change the Agreement's terms whenever it wants, by "redefining" the Contracted Service Area, or moving Contractors to different Stations or even States. FedEx can effectively "redefine" a Contracted Service Area out of existence or make it effectively unprofitable for a Contractor and the only remedy available to a Contractor is an empty determination about whether FedEx acted in bad faith.

49.      FedEx's Station Managers manage almost every aspect of each Station, including FedEx's relationship with the Contractors' and are often the primary point of contact to evaluate a Contractors' service results and safety scores. Station Managers enforce FedEx's policies and have discretion to decide whether a Contractor is meeting its' Agreement obligations.

50.      The Station Manager for the Austell station at all relevant times for this Complaint was Jaron Schopfer.

51.      Station Managers have a major, if not the final, say in deciding whether to on-board a new Contractor. They are, on information and belief, the person who determines whether an outgoing Contractor can assign their Contracted Service Area or whether a prospective Contractor can sign an Agreement with FedEx. And they have final review over package coding decisions, whether safety events were "preventable" or "non-preventable," and other key decisions that impact a Contractor's relationship with FedEx.

52.      On information and belief, Station Managers have the discretion to alter, amend, enforce, or waive Contractors' contractual deadlines as they see fit.

53.     FedEx, through its Station Managers and other management keep a "Business Discussion Record"[2] for each Contractor. This system lets the Station Manager or other FedEx management record interactions with the Contractor. This system is analogous to an employee file. Contractors may not see, let alone comment on, or disagree with, the entries FedEx Managements makes in the Business Discussion Record. On information and belief, FedEx specifically trains Station Managers and other FedEx Management not to disclose to Contractors that this shadow system exists.

54.      FedEx's system combined with the Station Managers' broad discretion creates a situation ripe for abuse.

55.     Despite contrary language in the Agreement, when FedEx ends its relationship with a Contractor, it cuts off the Contractor's access to MyGroundBiz FedEx (the Contractor's business records) and will only release these records to a Contractor after a contract ends responding to a subpoena or other legal compulsion.

The Medals System

56.     As discussed *supra*, beginning in late 2022 or early 2023, FedEx introduced the Medals System to rate Contractors' performance. This system used safety, delivery, and other metrics (without disclosing how FedEx would weigh those decisions) to categorize Contractors as "Gold," Silver," or "Bronze." FedEx began tying Contractor's opportunities to negotiate a new Agreement to their Medals scores during the preceding year. FedEx gave "Gold" Contractors the highest priority on renewal and the best rates, while "Bronze" Contractors would lose the opportunity to sign a new Agreement. If a Contractor remained Bronze for too long, FedEx could end the Contractor's Agreement.

57.     FedEx makes no reference to the Medals System anywhere in the Agreement.

58.     Contractors learned about the Medal System through a MyGroundBiz.com announcement. FedEx introduced the Medals System ostensibly to give the renewal/renegotiation

---

[2] A/k/a a BDR (See footnote 1).

process more transparency. But in practice the Medal System is inscrutable and does not align with other tracking data available to Contractors

59.    FedEx personnel, typically the Station Manager or their assistant, would conduct Monthly "Medals Meetings" (a/k/a. a "performance review") with each Contractor. Each month's medal category was allegedly based on the previous month's metrics. The system also gave the Contractors a "Trending" rating for the next month which predicted how a Contractor would perform in the future. FedEx never explained to SIWO how it calculated the either the look-back score or the Trending score.

60.    Major factors in the Medals evaluation are the Contractor's delivery numbers and "safety scores" which classified accidents as "preventable" or "non-preventable." "Preventable" accidents have a larger negative impact on Contractors' medal scores than non-preventable accidents.

61.    Whether an accident is preventable or not is, on information and belief, up to FedEx's discretion and evaluation.

62.    Medal scores also ostensibly account for Contractor's size, giving some Contractors more leeway for accidents based on the fleet size.

SIWO's Business Relationship with FedEx

63.    Brian Wei incorporated SIWO on August 30, 2021, so that he could through SIWO contract with FedEx.

64.    On March 19, 2022, SIWO arranged to buy a Contracted Service Area from LDHJ, Inc. an outgoing Contractor in FedEx's Austell Station, in Austell, Georgia.

65.    Mr. Wei met with Jaron Schopfer to see if FedEx would consent to SIWO buying LDHJ's Contracted Service Area. Mr. Schopfer consented to the sale on January 14, 2022. Shortly thereafter, SIWO executed a new Agreement with FedEx—it did not assume the outgoing Contractor's Agreement—and began servicing the Contracted Service Area on March 19, 2022. This Agreement's end date was set for October 20, 2022.

66.     During this first Agreement Term, FedEx did not have or use the Medal System. When the time came, SIWO successfully negotiated a new Agreement for another year.

67.     When SIWO's First Agreement expired, FedEx and SIWO negotiated a new Agreement which went into effect on October 12, 2022 ("Second Agreement").

68.     In the Second Agreement, FedEx dramatically decreased SIWO's financial compensation. While SIWO protested and asked to negotiate for more money, SIWO (and FedEx—because it had access to SIWO's financial information through MyGroundBiz) knew SIWO's only alternatives were selling the Contracted Service Area or face financial ruin. Faced with that Hobson's choice, SIWO agreed to the lower payment, and continued servicing its Contracted Service Area as before.

69.     During the Second Agreement, FedEx rolled out the Medals system. In the original form, a Bronze Contractor had three months to improve to Silver before FedEx would end the Agreement or decide not to renew. The Medals system also gave forward looking "Trending" classifications.

70.     During the Second Agreement SIWO maintained a Silver Medal ranking and FedEx gave SIWO the opportunity to sign a new Agreement.

71.     To stabilize its income, SIWO bought another Contracted Service Area from an outgoing Contractor on October 7, 2023.

72.     SIWO signed a new Agreement, incorporating its newly purchased Contracted Service Area on October 10, 2023 ("Third Agreement").

<u>The Third Agreement</u>

73.     In SIWO's Third Agreement SIWO had to "achieve a daily Inbound Local Service level of at least 98.5% of the daily average Inbound Local Service level attained by either the [FedEx] Station..."

74.     SIWO also had an obligation to ensure that its drivers delivered packages and drove safely (avoiding preventable accidents).

75.     Both these obligations played a significant role in SIWO's medals classification.

76.     At the beginning of April 2024, Mr. Schopfer informed Mr. Wei that SIWO was a Bronze Contractor, Trending Bronze, and needed to improve its Medals rating.

77.     According to conversations between Wei and Mr. Schopfer, FedEx graded SIWO as Bronze, because several of SIWO's trucks had been involved in preventable accidents. Despite police reports to the contrary, FedEx concluded that these accidents were preventable. SIWO appealed FedEx's "preventable" decision to FedEx, but the appeal went unanswered.

78.     On April 26, 2024, SIWO received a message from FedEx via MyGroundBiz.com informing SIWO that, at that time, FedEx had not approved SIWO to negotiate a new Agreement. The notice gave SIWO three months, until July 26, to achieve a Silver rating or FedEx would not negotiate a new Agreement with SIWO.

79.     After April 26, Mr. Wei began meeting with Mr. Schopfer, and a FedEx Pick-up and Delivery Manager on a weekly basis to discuss SIWO's performance.

80.     During a weekly meeting in April, Mr. Wei asked Mr. Schopfer about SIWO's options for selling its Contracted Service Area. Mr. Schopfer told Mr. Wei he would check and get back to him about it.

81.     In May, SIWO was a Bronze Contractor again, but in a change from April, it was now Trending Silver.

82.     Despite Trending Silver for June at the May update, FedEx deemed SIWO to be a Bronze Contractor in June.

83.     During the meeting to discuss SIWO's most recent Bronze rating, Mr. Wei asked Mr. Schopfer why SIWO was Bronze, given some accidents had aged out of any look-back window and SIWO was meeting its 98.5% inbound local service requirements. Mr. Schopfer did not explain why.

84.     At this same meeting, Mr. Schopfer and Mr. Wei discussed what SIWO could do to improve its Medals rating. Despite SIWO's alleged independent contractor relationship with FedEx, Mr. Schopfer pointed out that Mr. Wei had been absent from the station for several

weeks—Mr. Wei was satisfying his annual training requirement as a member of the Marine Corp Reserves—and he advised Mr. Wei that his role at FedEx as a Contractor's Owner was more of a manager and that he should really be at the Station taking a hands-on role as much as possible.

85.     Without warning, on June 27, 2024, FedEx announced more changes to the Medals System. FedEx changed the "Medals and Recontacting Review Period" which FedEx reported was:

      a.   to remove the "Projected Classifications" (a/k/a, "Trending"),

      b.   to classify Contractors based solely on the current month's classification, instead of a rolling three-month window, and

      c.   to incorporate a continuous classification that would incorporate up to 12 months of historical results.

FedEx intended to rely on these new classifications for a "Recontracting Evaluation," i.e., whether SIWO could enter a new Agreement for another year. Finally, FedEx announced that FedEx would evaluate certain events alongside the Medals rating when deciding whether to offer to negotiate a new Agreement. These included a safety rating in Teir 1 (the lowest of five), a Bronze continuous classification or a failure to cure a safety or security breach. FedEx also shortened the Recontracting Review Period from six months before an Agreement ended to "approximately four months before the expiration date."

86.     As part of these drastic changes, FedEx removed Contractor's opportunity to improve their medals or safety scores before FedEx decides whether to negotiate a new contract. FedEx implemented these changes on June 26, 2024, and informed Contractors of the changes a day later.

87.     These unilateral contractual changes, made without warning, meant SIWO could not achieve satisfactory Medals score to negotiate a new Agreement because it could not achieve a Silver continuous classification in the window provided. Even though FedEx had given SIWO until July 26 to improve its medals score to Silver under the old rules, it now didn't matter. Under the new rules, SIWO had until June 26 to have a Silver or better continuous medals score.

88.     Despite these setbacks, Mr. Wei continued to push for SIWO to get an opportunity to renew its Agreement or sell. At a meeting with Mr. Schopfer on July 2, 2024, Mr. Schopfer told Mr. Wei that he doubted FedEx would negotiate another Agreement with SIWO. As an alternative, Mr. Wei again raised the idea of selling SIWO's Contracted Service Area if SIWO did not achieve a Silver ranking before SIWO passed the 90-day window to get FedEx's consent to sell. Mr. Schopfer deflected Mr. Wei's inquiries and promised to get back to Mr. Wei.

89.     At the same meeting, Mr. Wei pointed out that according to the information he had on MyGroundBiz, SIWO was meeting its delivery quotas, even though on the Medals sheet that Mr. Schopfer provided him, SIWO was not meeting its delivery quotas. Mr. Schopfer did not explain the discrepancy.

90.     On July 9, 2024, Mr. Schopfer let SIWO know that because SIWO did not reach Silver, FedEx would not renew the Agreement. Mr. Schopfer would post SIWO's Contracted Service Area online for public bids. Mr. Wei asked Mr. Schopfer to post it anonymously, because Mr. Wei was concerned that SIWO's drivers—if they saw that SIWO's Contracted Service Area was up for auction—would all resign and prevent SIWO from meeting its contractual obligations through the end of the term.

91.     In the same meeting Mr. Wei again asked for permission to sell SIWO's Contracted Service Area to another Contractor in the station. Mr. Schopfer informed Mr. Wei that his deadline to sell may have already passed. Mr. Schopfer told Mr. Wei that he would need to confirm whether SIWO was "large enough" to sell—even though SIWO initially bought a smaller Contracted Service Area and bought a second Contracted Service Area later. Mr. Schopfer warned Mr. Wei that if FedEx deemed SIWO's Contracted Service Area too small to sell, FedEx would not let SIWO buy another Contracted Service Area to make it large enough to sell. At this point, SIWO still did not receive an actual answer if it could sell its Contracted Service Area to anyone.

92.     At the same time, SIWO had found a potential buyer, Wazzoo Logistics ("Wazoo;" another Contractor in the Austell Station). But shortly after SIWO and Wazzoo began their due diligence, Wazzoo cut off all contact with SIWO.

93.     On July 16, 2024, Mr. Schopfer posted SIWO's Contracted Service Area for public bids. Due to the long process of bidding and accepting a new Contractor, SIWO believed that it could still be able to sell the Contracted Service Area.

94.     On July 18, 2024, Mr. Schopfer informed SIWO that FedEx would not consent to any sale SIWO proposed.

95.     Following that meeting and later that day, Mr. Wei emailed Mr. Schopfer about selling SIWO's Contracted Service Area. Wei also asked Mr. Schopfer to reconsider SIWO's Medals status. Mr. Wei asked to speak to someone who could explain how FedEx calculated SIWO's Medals score. Mr. Schopfer offered to let Mr. Wei speak to a FedEx engineer about it. Mr. Wei accepted.

96.     On July 24, Mr. Wei once again emailed Mr. Schopfer for confirmation or consent to sell SIWO's Contracted Service Area. Mr. Schopfer never responded.

97.     When FedEx published July medal scores, SIWO had improved to Silver and under the old Medals rules, would have been eligible to negotiate a new Agreement.

98.     Mr. Wei met with FedEx's engineer, Jared, on August 5th and 6th, to go over SIWO's Medals scores. Jared refused to answer Mr. Wei's questions and told Mr. Wei that he had no idea how FedEx calculated the Medals scores. Jared offered to investigate and follow up. Jared never followed up.

Further Wrongdoing by FedEx Pursuant to its Decision to Allow Negotiation or Sale

99.     In early August, Mr. Schopfer let SIWO know that it was not eligible to negotiate a new Agreement or to sell its Contracted Service Area. By mid-August, Mr. Schopfer began targeting SIWO with "customer complaints."

100.     Mr. Schopfer asserted that customers had complained about missed delivery deadlines. Mr. Schopfer accused SIWO or its drivers of intentionally miscoding packages as undeliverable. When Mr. Wei asked him to name which customers had complained, Mr. Schopfer refused to answer. Mr. Schopfer overrode SIWO's entered codes and demanded SIWO improve. At this point, Mr. Schopfer threatened to take SIWO's routes and assign them to another Contractor.

101.    On August 16, 2024, Mr. Schopfer orally informed SIWO that on August 19, 2024, FedEx would re-assign routes from SIWO's Contracted Service Area. He did not explain why or follow any of the procedures outlined in the Agreement to "redefine" (i.e., change or reassign all or part of) the Contracted Service Area or exercise FedEx's "Right to Ensure Service."

102.    On August 19, 2024, FedEx assigned routes from SIWO's Contracted Service Area to Wazzoo, the same Contractor who had previously started due diligence with SIWO to buy SIWO's routes and had suddenly and unexplainedly cut off contact.

103.    SIWO protested the reassignment, arguing that FedEx had not followed its own contractual obligations before reassigning routes. FedEx ignored SIWO's communications.

104.    On August 21, 2024, FedEx cut another route from SIWO's Contracted Service Area, this time, without any notice. Mr. Schopfer assigned this route to Wazzoo, the same Contractor as before.

105.    On August 27, 2024, FedEx posted a proposal on MyGroundBiz.com for Wazzoo—SIWO's erstwhile potential buyer—to "absorb" SIWO Logistics. This proposal came without warning and when SIWO tried to contact Mr. Schopfer as to its meaning he ignored SIWO's requests for clarification.

106.    In early September 2024, Wazzoo began actively recruiting SIWO's drivers and its owner belligerently threatening Mr. Wei when he tried to stop it. Mr. Wei emailed Mr. Schopfer and other members of FedEx's Station management, asking them to intervene in what was effectively a hostile takeover of SIWO's routes and drivers. No one from FedEx bothered to reply to Mr. Wei's requests.

107.    On September 9, 2024, Wazzoo's owner, Robert Towns, came to SIWO's load station and informed its drivers that SIWO's contract was ending in about a month and would not be renewed. Mr. Wei confronted him, which led to a verbal altercation. Again, SIWO asked FedEx's management, including Mr. Schopfer, to intervene in the hostile work environment. They ignored his request.

108.    Shortly after the September 9th altercation, several of SIWO's drivers quit without warning.

109.    On October 3, 2024, Towns and Wazzoo's assistant managers approached all SIWO's drivers and again announced that SIWO's contract was ending. More SIWO drivers quit without warning. Mr. Wei emailed FedEx management for the third time, worried that without some intervention, SIWO would not have enough Drivers and not be able to meet its contractual obligations. He received no response.

110.    Without sufficient drivers, SIWO was unable to provide proper service to SIWO's Contracted Service Area.

111.    On October 9, 2024, FedEx assigned Wazzoo more of SIWO's routes.

112.    SIWO's Agreement ended on October 10, 2024.

113.    Later that month, Mr. Wei returned to collect various items which belonged to SIWO from the Station. FedEx security escorted Mr. Wei out of the property and informed him that he could not access the Station anymore.

114.    Wei later learned Mr. Schopfer had assigned SIWO's entire Contracted Service Area to Wazoo Logistics.

**CAUSES OF ACTION**
**COUNT I: BREACH OF CONTRACT AND**
**THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

115.    SIWO Logistics realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

116.    The Agreement governs the relationship between FedEx (formerly FedEx Ground) and SIWO, along with other FedEx policies.

117.    In either late 2022 or early 2023, FedEx implemented the Medal System in the Austell Station.

118.    According to the information available to SIWO vis-à-vis the Medal System, if a Contractor delivers more than 99% of its assigned packages per day, maintains satisfactory safety ratings and follows other security obligations, FedEx will classify the Contractor as Silver or Gold.

119.    According to the Agreement, if SIWO met its daily local inbound quota of 98.5% of the Station average and satisfied its safety and security obligations, it would meet its contractual obligations.

120.    According to the Medal System, if SIWO had a Silver or Gold classification at least ninety days before its Agreement expires, FedEx would extend the Contractor an opportunity to negotiate for a new Agreement.

121.    SIWO met its obligations to negotiate a new agreement with FedEx under the then-applicable Medals system in June 2024 and the old Medals system in July 2024. FedEx Breached the Agreement when it did not classify SIWO appropriately.

122.    FedEx breached the Medals System when it did not provide SIWO ninety days to improve its Medal score.

123.    Despite performing adequately to achieve at least a Silver Medal classification in the relevant time, FedEx did not extend to SIWO its right to negotiate a renewal to the Agreement.

124.    FedEx's conduct materially breached the Agreement, the Medal policies, and the implied covenant of good faith and fair dealing.

125.    FedEx's actions have damaged SIWO Logistics in amounts to be proven at trial.

## COUNT II: BREACH OF CONTRACT

### Imposition of Different and Arbitrary Delivery Criteria on SIWO

126.    SIWO realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

127.    SIWO's contractual Safety obligations are set out in Schedule I of the Agreement.

128.    Schedule I includes provisions regarding SIWO's obligations to train employees, ensure they satisfy various federal requirements to drive commercial vehicles and imposes a duty to ensure safe operations on SIWO.

129.    Schedule I includes a Modification of Terms clause, which lets FedEx "modify the terms of this Schedule I in connection with changes in Applicable Law, regulatory obligations, and/or safety compliance results or obligations." It does not let FedEx modify the Agreement without reason.

130.    Schedule I of the Agreement does not refer to or incorporate the Medals system.

131.    On information and belief, FedEx arbitrarily and capriciously decided that one or more accidents involving SIWO's vehicles were preventable, when all reasonable evidence to the contrary including police reports, concluded those accidents were non-preventable.

132.    SIWO's contractual Service obligations are set out in Schedule A of the Agreement.

133.    SIWO must, under Schedule A-2, "achieve a daily Inbound Local Service level of at least 98.5% of the daily average Inbound Local Service level attained by either the [FedEx] Station..."

134.    SIWO maintained contractually satisfactory daily Inbound Local Service levels during its Agreement terms.

135.    Schedule A does not include a Modification of Terms or similar clause that could alter SIWO's contractual service obligations.

136.    The Agreement, Schedule A, does not refer to, or incorporate the Medal System.

137.    Despite meeting its contractual obligations, according to the metrics posted on SIWO's MyGroundBiz Account, FedEx repeatedly decided that SIWO was not meeting its contractual obligations in Medals evaluations.

138.    FedEx breached the Second Agreement when it imposed different delivery criteria on SIWO from the formula described Schedule A.

139.    Under the Agreement, FedEx has broad authority to amend the Agreement and other terms and conditions, but it must provide reasonable notice before it does.

140.    FedEx amended the Medals System to drastically alter, and ultimately strip, SIWO's opportunity to negotiate a new Agreement term without notice, reasonable or otherwise. FedEx amended the terms on June 26, 2024, and did not publish the Amendments until June 27, 2024.

141.    FedEx breached the Second Agreement when it imposed—and later the Third Agreement when it amended, without warning—the Medals System.

142.    These breaches have damaged SIWO in amounts to be proven at trial.

### COUNT III: BREACH OF CONTRACT AND
### THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**Violation of the Mutual Intention to Optimize Contracted Service Area, Redefinition**

143.    SIWO realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

144.    The Agreement governs SIWO's relationship with FedEx, along with other FedEx policies.

145.    The Agreement, under FedEx's "Right to Ensure Service" provides that "Before [FedEx] exercises its Right to Re-assign [Routes under FedEx's right to Ensure Service], [FedEx] will give [SIWO] written notice that it considers a request for Services to be standing or continuing and the opportunity to provide the Services."

146.    FedEx reassigned several routes from SIWO's CSA, without notice, and without giving SIWO an opportunity to address FedEx's concerns or to rectify any alleged problems with its performance.

147.    In reassigning SIWO's routes without notice or opportunity to cure, FedEx breached the ISPA and the implied covenant of good faith and fair dealing.

148.    FedEx's actions have damaged SIWO in amounts to be proven at trial.

## COUNT IV: BREACH OF CONTRACT AND
## THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### Violation of the Assignment Clause

149.     SIWO realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

150.     The Agreement includes an Assignment provision, which provides that "Neither Party is authorized to assign this Agreement without the prior written consent of the other, which consent will not be unreasonably withheld." The Agreement also included a provision that FedEx "shall not be obligated to consider an assignment proposed with [90] calendar days of the Expiration Date or any termination date of this Agreement."

151.     SIWO first sought to confirm that SIWO could sell in April 2024, approximately seven months before the Agreement's Termination Date. FedEx management refused to answer SIWO's requests, often saying they would "check and get back" to SIWO (and then failing to do so). Despite such assurances, no one from FedEx answered SIWO's question in a reasonable time.

152.     Despite several requests to sell over several months, FedEx refused to confirm or deny whether SIWO could sell.

153.     Even after the ninety-day window had passed, FedEx management still engaged in the "check and get back" game. For example, on July 18, 2024, FedEx's DBS Manager William Clark informed SIWO that SIWO could sell its contract (a statement which was either intentionally false when made or which FedEx later rescinded).

154.     In not answering SIWO's questions about selling and actively lulling SIWO into inaction, FedEx did not engage with SIWO in good faith and with fair dealing and denied it the opportunity to sell its Contracted Service Area.

155.     FedEx's actions have damaged SIWO in amounts to be proven at trial.

## COUNT V: BREACH OF CONTRACT AND
## THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### Violation of the Honesty and Integrity Clause

156.    SIWO realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

157.    The Agreement requires that "The Parties agree to conduct all business activities safely and professionally, with honesty and integrity, and in accordance with Applicable Law at all times."

158.    On information and belief, Mr. Schopfer, acting as FedEx's agent, falsely represented to SIWO that he was inquiring as to SIWO's requests to reevaluate its Medal scores and to sell its Contested Service Area.

159.    On information and belief, Mr. Schopfer, acting as FedEx's agent, did not interact with SIWO with honesty and integrity and further purposely withheld from SIWO the deadline the FedEx imposed to sell its Contracted Service Area.

160.    Due to Mr. Schopfer's inaction and misrepresentations, SIWO suffered great financial damages due to not being able to sell the Contracted Service Area and to being able to correct its Medal score.

161.    FedEx is liable for Mr. Schopfer's conduct by way of agency and Respondeat Superior.

162.    FedEx's conduct breached the Agreement and the implied covenant of good faith and fair dealing.

163.    Furthermore, FedEx breached the Agreement's Honesty and Integrity Clause and the implied covenant of good faith and fair dealing by not allowing SIWO to sell its Contracted Service Area.

164.    These actions have damaged SIWO in amounts to be proven at trial.

## COUNT VI: DECLARATORY RELIEF ON THE DELEGATION CLAUSE

165.    SIWO realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

166.    The Agreement has an Arbitration Clause that purportedly governs all disputes arising between parties to the Agreement regardless of the underlying legal theories. The Arbitration Clause includes a Delegation clause which requires an Arbitrator to decide whether the Arbitration Clause applies.

167.    FedEx's Agreement does not have separate Arbitration and Delegation clauses.

168.    On information and belief, the Delegation Clause is adhesive. FedEx will not contract with a Contractor unless the Agreement includes the Delegation clause in the exact language that FedEx sends to a putative Contractor.

169.    FedEx enjoys vastly superior bargaining power compared to SIWO.

170.    The Agreement sets forth the procedures that govern the Parties when they arbitrate the Delegation Clause.

171.    However, the Arbitration Procedures are set up to dead-end any possible claim. The arbitrator's power to assess an award or act on the parties' motions is severely limited under the Agreement.

172.    According to the Agreement "The arbitrator shall have no authority to enter an award that alters, amends, or modifies any of the terms and conditions of this Agreement, in any form or manner, or otherwise take action having the same or similar effect."

173.    Under the terms of the Agreement, the arbitrator cannot remove action from arbitration. The terms of the Agreement do not let the arbitrator find the arbitration clause does not apply and then send the claim back to a Court because that would have a "similar effect" to altering, amending, or modifying the terms or conditions of the Agreement, which the Arbitrator is not allowed to do.

174.    In the Delegation Clause, the Agreement specifically contemplates the parties seeking provisional remedies: "This clause shall not preclude the Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction."

175.    The Arbitration and Delegation clauses expressly exclude this claim for declaratory relief because it aids arbitration by deciding whether the delegation clause is enforceable at all.

176.    SIWO seeks declaratory relief that the Delegation clause—given the Arbitration Procedures which govern any arbitration of the enforceability of the Arbitration Clause, the Agreement' Delegation clause—is unconscionable and therefore unenforceable.

**COUNT VII: DECLARATORY RELIEF ON THE ARBITRATION CLAUSE**

177.    SIWO realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

178.    FedEx's Agreement sets forth the Arbitration Procedures.

179.    Like the Delegation Clause, the Arbitration Clause is adhesive. FedEx will not contract with a Contractor unless the Agreement includes the Arbitration clause and the Arbitration Procedures in the exact language FedEx provides to a Contractor during each negotiation.

180.    FedEx enjoys vastly superior bargaining power compared to SIWO.

181.    FedEx uses the Arbitration Procedures to severely curtail and dead-end any claim that is sent to arbitration.

182.    FedEx purports to impose severe discovery limits on each party: just three depositions, none of which can be corporate representatives (despite the Agreement ostensibly being between two corporations), twenty-five interrogatories and twenty-five Requests for Production. The parties are allowed just three custodians for electronic records and the parties may not identify custodians from beyond the Station they contracted at.

183.    FedEx's Arbitration Procedures block any discovery or litigation that may uncover systemic abuse or problems.

184.    While these limitations are facially mutual, in practice the difference in size, complexity, and scope of each entity makes the discovery limitations exceedingly one-sided. FedEx is one of the largest companies in the world with a deep bureaucracy and a complex structure. Meanwhile, SIWO was Mr. Wei, two assistant managers, and between twelve and eighteen drivers.

185.    FedEx polices limit SIWO's leadership to three or less people. The Agreement compels SIWO to have—in addition to an Owner—an Authorized Officer and a Business Contact. FedEx also already has all the corporate documents a Contractor creates, because Contractor must keep them on FedEx's MyGroundBiz platform. Because both sides are limited to three depositions, FedEx can depose SIWO's upper management, while SIWO may depose three people from the Austell Station, which apparently does not include anyone who knows how the Medals system works.

186.    In the Arbitration Clause, the agreement specifically contemplates the parties seeking provisional remedies. "This clause shall not preclude the Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction."

187.    In the Delegation Clause, the Agreement specifically contemplates the parties seeking provisional remedies. "This clause shall not preclude the Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction."

188.    The Arbitration and Delegation clauses expressly exclude this claim for declaratory relief because it aids arbitration by deciding whether the delegation clause is enforceable at all.

189.    SIWO seeks declaratory relief that the Arbitration clause—given the Arbitration Procedures which serve to create a one-sided discovery procedure that guts SIWO's ability to conduct meaningful discovery—is unconscionable and therefore unenforceable.

## COUNT IX: O.C.G.A. § 13-6-11.

190.    SIWO realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

191.    Defendant has acted in bad faith in connection with the events set forth herein, has been stubbornly litigious, and has caused Plaintiffs unnecessary trouble and expense.

192.    Per O.C.G.A. § 13-6-11, Defendant is therefore liable for Plaintiff's litigation expenses, including reasonable attorney fees.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, SIWO respectfully requests a jury trial and that the Court grant the following relief:

(a)    a money judgment against the Defendant in a specific amount to be determined at trial;

(b)    pre- and post-judgment interest at the statutory rate allowable;

(c)    SIWO's reasonable attorneys' fees and costs of litigation;

(d)    the declaratory relief requested herein; and

(e)    such other and further relief as the Court may deem just and equitable.

Dated this 11th day of July, 2025.

**POSSINGER LAW GROUP, PLLC**

*/s/ Jeffrey Possinger*

Jeffrey Possinger, WSBA #30854
Pro Hac Vice Application Forthcoming

20250 144th Avenue NE, Suite 205
Woodinville, Washington 98072
(t)  206-512-8030
(f)  206-569-4792
(e) jeffrey.possinger@possingerlaw.com

**COUNCILL, GUNNEMANN & CHALLY, LLC**

*/s/ Joshua P. Gunnemann*

Joshua P. Gunnemann
Georgia Bar No. 152250
jgunnemann@cgc-law.com
Hailey P. Barnett
Georgia Bar No. 284342
hbarnett@cgc-law.com

75 14th Street, NE, Suite 2475
Atlanta, Georgia  30309
Telephone: (404) 407-5250
Facsimile: (404) 600-1624

*Attorneys for Plaintiff*

# IN THE SUPERIOR COURT OF COBB COUNTY
## STATE OF GEORGIA

🌐 **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**25CV05255**

D. VICTOR REYNOLDS
JUL 11, 2025 04:30 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

CIVIL ACTION NUMBER  <u>25CV05255</u>

SIWO Logistics, Inc.

_____

**PLAINTIFF**

**VS.**

Federal Express Corporation

_____

**DEFENDANT**

### SUMMONS

TO: FEDERAL EXPRESS CORPORATION

You are hereby required to file with the Clerk of said court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

**Joshua P Gunnemann**
**Councill, Gunnemann & Chally, LLC**
**75 14th Street, NE**
**Suite 2475**
**Atlanta, Georgia 30309**
**jgunnemann@cgc-law.com**

an answer to the complaint which is herewith served upon you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

**This 11th day of July, 2025.**

Clerk of Superior Court

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

⬩ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**25CV05255**

**D. VICTOR REYNOLDS**
**JUL 21, 2025 12:14 PM**

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

**AFFIDAVIT OF SERVICE**

**State of Georgia**                     **County of Cobb**                    **Superior Court**

Case Number: 25CV05255

Plaintiff:
**SIWO LOGISTICS, INC.**

vs.

Defendant:
**FEDERAL EXPRESS CORPORATION, a
Delaware corporation**

For:
COUNCILL, GUNNEMANN & CHALLY, LLC
75 14th St. NE
Suite 2475
Atlanta, GA 30309

Received by Absolute Legal Services to be served on **FEDERAL EXPRESS CORPORATION
Registered Agent: A Delaware Corporation, 410 Peachtree Parkway, Suite 4245, Cumming, GA
30041**.

I, Christopher Todd Horton, being duly sworn, depose and say that on the **16th day of July, 2025** at
**12:40 pm, I:**

served **FEDERAL EXPRESS CORPORATION Registered Agent: A Delaware Corporation** by
delivering a true copy of the **SUMMONS; COMPLAINT; GENERAL CIVIL AND DOMESTIC
RELATIONS CASE FILING INFORMATION FORM** with the date and hour of service endorsed thereon
by me, to: **David Holcomb**, title**: Process Specialist**, a person authorized to accept process for the
Company, **FEDERAL EXPRESS CORPORATION Registered Agent: A Delaware Corporation,** at the
address of: **410 Peachtree Parkway, Suite 4245, Cumming, GA 30041.**

**Description** of Person Served: Age: 56, Sex: M, Race/Skin Color: White, Height: 5'10", Weight: 180,
Hair: Balding, Glasses: Y

I certify that I am a citizen of the United States over the age of 18 and have no interest in the above-
styled case.

Signed and sworn before me on the ____ day of
____ by the affiant who is
personally known to me or produced identification.

_____
NOTARY PUBLIC

TIFFANY HORTON
NOTARY
EXPIRES
GEORGIA
5-18-2027
PUBLIC
GWINNETT COUNTY

**Christopher Todd Horton**
Process Server ID No. CPS243

**Absolute Legal Services**
**930 New Hope Road**
**Suite 11-110**
**Lawrenceville, GA 30045**
**(770) 736-8106**

Our Job Serial Number: RBC-2025001635
Ref: SIWO LOGISTICS, INC.

Copyright © 1992-2025 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0c

**General Civil and Domestic Relations Case Filing Information Form**

☑ **Superior** or ☐ **State Court of** Cobb   **County**

⚡ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**25CV05255**

D. VICTOR REYNOLDS
JUL 11, 2025 04:30 PM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

| **For Clerk Use Only** | |
|---|---|
| **Date Filed** 07-11-2025 | **Case Number** 25CV05255 |
| MM-DD-YYYY | |

| **Plaintiff(s)** | | | | | **Defendant(s)** | | | | |
|---|---|---|---|---|---|---|---|---|---|
| SIWO Logistics, Inc. | | | | | Federal Express Corporation | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney** Gunnemann, Joshua P   **Bar Number** 152250   **Self-Represented** ☐

### Check one case type and, if applicable, one sub-type in one box.

**General Civil Cases**
- ☐ **Automobile Tort**
- ☐ **Civil Appeal**
- ☑ **Contract**
- ☐ **Contempt/Modification/Other Post-Judgment**
- ☐ **Garnishment**
- ☐ **General Tort**
- ☐ **Habeas Corpus**
- ☐ **Injunction/Mandamus/Other Writ**
- ☐ **Landlord/Tenant**
- ☐ **Medical Malpractice Tort**
- ☐ **Product Liability Tort**
- ☐ **Real Property**
- ☐ **Restraining Petition**
- ☐ **Other General Civil**

**Domestic Relations Cases**
- ☐ **Adoption**
- ☐ **Contempt**
  - ☐ **Non-payment of child support, medical support, or alimony**
- ☐ **Dissolution/Divorce/Separate Maintenance/Alimony**
- ☐ **Family Violence Petition**
- ☐ **Modification**
  - ☐ **Custody/Parenting Time/Visitation**
- ☐ **Paternity/Legitimation**
- ☐ **Support – IV-D**
- ☐ **Support – Private (non-IV-D)**
- ☐ **Other Domestic Relations**

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____   _____
      **Case Number**                **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____
       **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

_____

_____